IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | § § § | |
| Plaintiff, | § § | |
| v. | § § | Civil Action No. 3:13-CV-4861-K |
| ARCTURUS CORPORATION, ASCHERE ENERGY, LLC, LEON ALI PARVIZIAN, ALFREDO ALFREDO GONZALEZ, AMG ENERGY, LLC, ROBERT J. BALUNAS, and R. THOMAS & CO., LLC, | § § § § § § § § | |
| Defendants. | § § | |

## MEMORANDUM OPINION AND ORDER

Before the Court are:  (1) Defendants Arcturus Corporation, Aschere Energy,

LLC, and Leon Ali Parvizian's Motion for Summary Judgment (Doc. No. 32), in

which Defendants Robert J. Balunas and R. Thomas & Co., LLC, and Alfredo

Gonzalez and AMG Energy, LLC, joined (Doc. Nos. 35 & 36 respectively);

(2) Plaintiff Securities and Exchange Commission's Motion for Summary Judgment

(Doc. No. 37); (3) Plaintiff Securities and Exchange Commission's Objections to, and

Motion to Strike Defendants' Summary Judgment Evidence (Doc. No. 43); and

(4) Defendants Arcturus Corporation, Aschere Energy, LLC, and Leon Ali Parvizian's

ORDER – PAGE 1

Motion to Strike Declaration of Ty Martinez (Doc. No. 49).  The Court has carefully reviewed and considered the motions, the responses, the replies and supporting appendices, the applicable law, and the relevant portions of the record.  The Court **DENIES** (1) Defendants' motion for summary judgment, (2) **GRANTS** Plaintiff's motion for summary judgment, (3) **DENIES** Plaintiff's motion to strike, and (4) **DENIES** Defendants' motion to strike.

## I.      Factual Background

Defendant Leon Ali Parvizian ("Parvizian), a British citizen with permanent U.S. residency, formed and controlled Defendants Arcturus Corporation ("Arcturus") and Aschere Energy, LLC ("Ashchere"), both Texas corporations based in Dallas.  From 2007 through 2011, Parvizian, Arcturus and Aschere (collectively "Parvizian Defendants") offered and sold interests in six oil and gas well drilling projects which became the subject of an investigation by Plaintiff Securities and Exchange Commission ("SEC")—Hillcock, Piwonka, Conlee, Frayley-Nelson, Chips Joint, and Wied Field.  Each project had a "Managing Venturer" which supervised and managed the respective project, and which earned "Management Fees" paid by the project. Arcturus was the Managing Venturer of the Hillcock and Piwonka drilling projects. Aschere was the Managing Venturer of the Conlee, Fraley-Nelson, Chips Joint, and Wied Field drilling projects.

The SEC contends that these drilling projects were in actuality securities, and the Parvizian Defendants attempted to avoid the reach of securities laws by referring to the oil and gas well drilling projects as "joint ventures" and the investors as "partners" or "venturers".  The Parvizian Defendants argue these drilling projects were actually Joint Ventures, not securities, and the partners funded, not invested in, these ventures.  The Parvizian Defendants further allege that these partners had powers and rights, as well as liabilities and management obligations, under the Joint Venture Agreements ("JVA") for each respective drilling project.  (The Court will refer to these oil and gas well drilling projects as Joint Ventures and the investors as "venturers" or "partners" only for purposes of simplicity in the Factual Background; this is not a finding by the Court that these projects are indeed Joint Ventures thereby escaping securities law.)

Parvizian sold these JVs through Defendant companies R. Thomas & Co., LLC ("R. Thomas"), a Florida limited liability company, and AMG Energy, LLC ("AMG"), a Texas limited liability company.  Neither company was a registered broker. R. Thomas was started and managed by Defendant Robert J. Balunas ("Balunas"), a Florida resident.  R. Thomas had a "consulting agreement" with Aschere which provided that Balunas earned a 12% commission on each prospective venturer he "introduced" to a Joint Venture.  Balunas would call prospective venturers from a

"lead list" and give any interested persons information about the Joint Venture he was "introducing".  Balunas would provide Parvizian with the interested person's contact information.  Balunas used "lead lists" of prospective venturers which he created and maintained from cold calls he had previously made; there was no prior relationship between any potential venturer and the Parvizian Defendants.  Parvizian closed the sales of a venture interest, and any money received from a sale was deposited into bank accounts controlled exclusively by Parvizian.  In addition to the 12% commission, Parvizian also paid Balunas $4,000 monthly as a "retainer".

AMG was set up by Parvizian for Defendant Alfredo Gonzalez ("Gonzalez"), a Chilean citizen residing in Dallas.  Gonzalez was president of the company.  AMG had a "consulting agreement" with Aschere under which AMG would offer and sell the Joint Ventures.  Parvizian paid AMG $500 each week per AMG employee for their salaries.  In addition, AMG employees were paid 10% commission for each venture unit the employee sold, and AMG earned 2% commission for each venture unit its employee sold.  AMG employees made cold calls to potential venturers whose information came from "lead lists" purchased by the Parvizian Defendants.  Certain AMG employees were in charge of giving potential venturers the venture offering's terms and then finalizing the sale.  All money received from a sale was deposited into bank accounts controlled exclusively by Parvizian.

ORDER – PAGE 4

Parvizian prepared the Joint Venture written materials that were given to potential venturers.  These included:  (1) Confidential Information Memoranda ("CIMs") that generally described the operation of the venture; (2) Private Placement Memoranda ("PPMs") which were glossy brochures containing a summary of the venture; (3) Joint Venture Agreements ("JVAs") which contained detailed information about the venture operations; (4) subscription agreements; and (5) investor questionnaires (collectively "Offering Documents").

The SEC filed this civil enforcement action on December 12, 2013, alleging Defendants violated Sections 5(a), 5(c) and 17(a) of the Securities Act of 1933 ("Securities Act"), and Sections 10(b) and 15(a) of the Securities Exchange Act of 1934 ("Exchange Act"), and Rule 10b-5 thereunder.  The SEC seeks permanent injunctions, disgorgement plus pre- and post-judgment interest, and civil penalties. The Court previously denied the Defendants' motions to dismiss.  The Parvizian Defendants filed a motion for summary judgment that is currently before the Court and which Defendants Balunas, R. Thomas, Gonzalez and AMG joined.  The SEC then filed a competing motion for summary judgment which is also currently before the Court.  The SEC and the Parvizian Defendants each filed a motion to strike specific summary judgment evidence submitted.

## II.  Summary Judgment Motions

### A. Legal Standard

Summary judgment is appropriate when the pleadings, affidavits and other summary judgment evidence show that no genuine issue of material fact exists, and the moving party is entitled to judgment as a matter of law.  FED.R.CIV.P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  A dispute of a material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict in favor of the nonmoving party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). All evidence and reasonable inferences must be viewed in the light most favorable to the nonmovant, and all disputed facts resolved in favor of the nonmovant.  See *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962); *Boudreaux v. Swift Transp. Co., Inc.*, 402 F.3d 536, 540 (5th Cir. 2005).

If the movant bears the burden of proof on an issue at trial, the movant "must establish beyond peradventure *all* of the essential elements of the claim" in order to obtain summary judgment on those issues.  *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir. 1986).  If the movant does not bear the burden of proof at trial, then the moving party must identify those portions of the record it believes demonstrate the absence of a genuine issue of material fact.  *Celotex*, 477 U.S. at 322-25.  Once the movant satisfies his burden, the nonmovant must show a genuine fact issue for trial

exists.  *Id.* at 321-25; *Anderson*, 477 U.S. at 255-57.  To meet this burden, the

nonmovant may not rest on the pleadings, but must designate specific facts in the

record establishing a genuine issue of material fact exists.  *Celotex*, 477 U.S. at 325;

*Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994)(en banc).  The

nonmovant may satisfy this burden by providing depositions, affidavits, and other

competent evidence; not with "conclusory allegations, speculation, and

unsubstantiated assertions."  *Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1429

(5th Cir. 1996) (en banc).  Conclusory allegations, unsubstantiated assertions, or a

mere scintilla of evidence cannot defeat a motion for summary judgment.  *See*

*Anderson*, 477 U.S. at 249-52; *Boudreaux*, 402 F.3d at 540.  If the nonmovant fails to

meet his burden, summary judgment must be granted.  *Celotex*, 477 U.S. at 322.

## B. Applicable Law

The Securities Act and Exchange Act are remedial in nature and were enacted to

regulate investments in an attempt to protect against abuses of the securities market.

*See Reves v. Ernst & Young*, 494 U.S. 56, 60-61 (1990); *SEC v. Koskot Interplanetary,*

*Inc.*, 497 F.2d 473, 479-80 (5th Cir. 1974).  Section 2(1) of the Securities Act

broadly defines "security" so to intentionally "encompass virtually any instrument

that might be sold as an investment."  *Reves*, 494 U.S. at 61(quoting *United Housing*

*Foundation, Inc. v. Forman*, 421 U.S. 837, 847-48 (1975)).  In *SEC v. W.J. Howey Co.,*

328 U.S. 293 (1946), the Supreme Court explained that a broad definition of securities "embodies a flexible rather than a static principle, one that is capable of adaptation to meet the countless and variable schemes devised by those who seek the use of the money of others on the premise of profits." *Id.* at 299.

This sweeping definition of "security" includes the term "investment contract"; but, neither the Securities Act nor the Exchange Act defines this term.  The test for determining whether an investment scheme is an "investment contract" was set forth by the Supreme Court in *Howey*:

> In other words, an investment contract for purposes of the Securities Act means a contract, transaction or scheme whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of a promoter or a third party.

328 U.S. at 298-99; *see also Forman*, 421 U.S. at 852 ("[t]he touchstone is the presence of an investment in a common venture premised on a reasonable expectation of profits to be derived from the entrepreneurial or managerial efforts of others.").  In determining whether an investment scheme is an investment contract under Section 2(1), the Supreme Court has repeatedly stated that courts should disregard form for substance and focus on the "economic realities underlying a transaction, and not the name appended thereto." *Forman*, 421 U.S. at 848-49; *see Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen & Helpers of Am. v. Daniel*, 439 U.S.

ORDER – PAGE 8

551, 558-59 (1979)(substance of the transaction should control its classification instead of "the names that may have been employed by the parties."); *see also Williamson v. Tucker*, 645 F.2d 404, 418 (5th Cir. 1981)("[t]he Supreme Court has repeatedly emphasized that economic reality is to govern over form and that the definitions of the various types of securities should not hinge on exact and literal tests," when determining whether an interest is a security).  The Fifth Circuit stated that investment contracts include "financial instruments that may superficially resemble private commercial transactions" and, although they may "not bear the formal attributes of a security [ ] they are in actuality securities." *Youmans v. Simon*, 791 F.2d 341, 345 (5th Cir. 1986).

A general partnership or joint venture interest usually does not fall within the broad definition of "investment contract".  *Williamson*, 645 F.2d at 419-421 (when investors possessed, retained and had the ability to exercise real power in the joint venture or general partnership, courts uniformly refused to find those joint ventures or general partnerships were securities).  But, simply identifying or labelling an investment as a general partnership or joint venture does not preclude a court from finding that the investment is actually within the "reach of federal securities laws." *Id.* at 422-23.

There are three prongs to the *Howey* test to determine whether a scheme is an "investment contract":  "(1) an investment of money; (2) in a common enterprise; and (3) on an expectation of profits to be derived solely from the efforts of individuals other than the investor."  *Williamson*, 645 F.2d at 417.  The Fifth Circuit noted that a strict or literal interpretation of "solely" in the third factor would prevent the remedial purposes of the Securities Acts, which includes protecting investors.  *Koskot*, 497 F.2d at 480.  To determine whether profits are expected to come "solely" from the efforts of others, the Fifth Circuit adopted the test out of the Ninth Circuit which defined the critical question as "'whether the efforts made by those other than the investor are the undeniably significant ones, those essential managerial efforts which affect the failure or success of the enterprise.'"  *Id.* at 483 (quoting *SEC v. Glenn W. Turner*, 474 F.2d 476, 482 (9th Cir. 1973)).

The third *Howey* factor can be established if the partnership or venture is one in which the partners are "so dependent on a particular manager that they cannot replace him or otherwise exercise ultimate control."  *Williamson*, 645 F.2d at 424. The court can consider the following non-exclusive factors when determining whether general partners or joint venturers are so dependent on another's effort that the investment is actually an investment contract:

> (1)    An agreement among the parties leaves so little power in the hands of the partner or venturer that

the arrangement in fact distributes power as would a limited partnership; or

(2)   The partner or venturer is so inexperienced and unknowledgeable in business affairs that he is incapable of intelligently exercising his partnership or venture powers; or

(3)   The partner or venturer is so dependent on some unique entrepreneurial or managerial ability of the promoter or manager that he cannot replace the manager of the enterprise or otherwise exercise meaningful partnership or venture powers.

*Id.*

### C. Application of the Law to the Facts

The SEC moves for summary judgment on all of its claims against Defendants. First, the SEC contends that the Parvizian Defendants' oil and gas well offerings satisfy all three *Howey* factors, so they are investment contracts for purposes of federal securities law despite their general partnership/joint venture labels.  Because these offerings are securities, the SEC argues it has made a *prima facie* showing that all Defendants committed a securities violation by offering and selling unregistered securities, and that the individual Defendants committed a securities violation by being unregistered brokers-dealers.  Finally, the SEC contends that summary judgment is appropriate on its two claims of securities fraud against the Parvizian Defendants because its summary judgment evidence of two specific instances of fraud establishes that there is no genuine issue of material fact on either claim.

ORDER – PAGE 11

In response, the Defendants first argue that the SEC cannot meet its "heavy burden" to establish that the Joint Ventures are securities, and more specifically, that the third *Howey* factor cannot be established.  Because the SEC cannot establish these Joint Ventures are securities, the Defendants argue all of the SEC's claims necessarily fail.  As for the fraud claims, the Parvizian Defendants argue that even if the Court found the Joint Ventures to be securities, summary judgment is not appropriate because there are genuine issues of material fact related to the securities fraud allegations, especially as to the required element of scienter.

### 1. Joint Ventures Were Investment Contracts

As a threshold matter, the Court must first determine whether the oil and gas well offerings at issue here are actually investment contracts despite their "joint venture" labels, making the Joint Ventures securities subject to federal securities laws.  As previously outlined, an "investment contract" is defined by the Supreme Court as (1) individuals led to invest money, (2) in a common enterprise, and (3) having the expectation that they would earn a profit solely through the efforts of others.  *Howey*, 328 U.S. at 298-99.  There is no dispute money was invested by individuals in these oil and gas well offerings for testing, drilling and completing the wells, a common enterprise.  It is the third *Howey* factor that is in dispute—whether the investors expected they would earn a profit solely through the efforts of others.

If the partnership or joint venture is one in which the general partners or

venturers are "so dependent on a particular manager that they cannot replace him or

otherwise exercise ultimate control," the third factor is established.  *Williamson*, 645

F.2d at 424.  The Court can consider the following non-exclusive factors in

determining whether there is such dependence:

(1)    An agreement among the parties leaves so little power in the
        hands of the partner or venturer that the arrangement in fact
        distributes power as would a limited partnership; *or*
(2)    The partner or venturer is so inexperienced and
        unknowledgeable in business affairs that he is incapable of
        intelligently exercising his partnership or venture powers; *or*
(3)    The partner or venturer is so dependent on some unique
        entrepreneurial or managerial ability of the promoter or
        manager that he cannot replace the manager of the enterprise
        or otherwise exercise meaningful partnership or venture
        powers.

*Id.* (emphasis added).  The SEC need only establish one of the three factors.  *See*

*S.E.C. v. Merch. Capital, LLC*, 483 F.3d 747, 756 (11th Cir. 2007)("the presence

of one of the three *Williamson* factors renders even a general partnership interest

an investment contract.").

a)  Venturers had little or no actual power

The first *Williamson* factor the Court can consider is whether the agreement

between the parties gives the venturer little to no power, such as a limited partner

would have.  *Williamson*, 645 F.2d at 424.  A general partnership or joint venture

interest usually does not fall within the broad definition of "investment contract".

*Williamson*, 645 F.2d at 419-421 (when investors possessed, retained and had the

ability to exercise real power in the joint venture or general partnership, courts

uniformly refused to find those joint ventures or general partnerships were securities).

But limited partnerships may be considered a security under the statutory definition.

*Youmans*, 791 F.2d at 346.  Limited partners have limited liability, are typically

unable to dissolve the partnership or bind other partners, and have virtually no power

to take an active role in the management of the partnership.  *Id.* (limited partners do

not possess same kind of power normally held by general partners).  The SEC argues

these investors had "no real legal powers over their investment" and were not general

partners or venturers as the Defendants contend.  Specifically, the SEC contends the

venturers delegated any powers they might have had, and all control was possessed by

the Parvizian Defendants.  The Court finds the evidence submitted by the SEC

establishes the venturers had little power at best, but more realistically, no power at

all.

Each of the Parvizian Defendants' six oil and gas well offerings had a Joint

Venture Agreement ("JVA") which provided specific details of how the venture was

structured and would operate, including the assignment and delegation of powers and

duties.  The Parvizian Defendants argue the venturers did not initially delegate

control to Arcturus or Aschere when they signed the JVA and that any power delegated to the Managing Venturer is limited to day-to-day management and is subject to the "affirmative vote" of the venturers.  The summary judgment record establishes the venturers did delegate control at the outset.  Under the express language of the JVA, the venturers delegated all powers related to the day-to-day management as well as operations of the venture to either Arcturus or Aschere as the respective Managing Venturer.  The venturers also delegated "the power to act on behalf of, sign or bind the Joint Venture" or other venturers with the Managing Venturer under the express language of the JVA.  The JVA vested the Managing Venturer with "full and plenary power" over the drilling operations, and allowed the Managing Venturer to either "retain or act as operator(s)" for the purposes of testing, drilling and completing the well among other things.

In response, the Parvizian Defendants point the Court to the JVA language that the venture "shall be managed and controlled collectively by all the Venturers." The Parvizian Defendants contend the venturers had broad actual managerial powers under the JVA and they were expected to participate in the joint venture's operations. According to the Parvizian Defendants, these real powers included the ability to call a meeting and certain voting rights, such as the ability to remove the Managing Venturer and the ability to amend the JVA terms.  The Parvizian Defendants also

maintain that the Managing Venturer's powers were always "subject to the affirmative Vote of the Venturers" under the JVA, and this was a "significant" and "powerful" right related to management of the Joint Venture.

Despite the Parvizian Defendants' argument to the contrary, the Court cannot find that the venturers had any real, actual powers based on the summary judgment record. The only specific powers the Parvizian Defendants reference, the ability to call a meeting and voting powers to remove the Managing Venturer and to amend the JVA terms, require a certain percentage of Joint Venture interest. For example, the power to remove the Managing Venturer requires 60% interest vote. The SEC's summary judgment evidence establishes the venturers had no information about each other and, therefore, no way to contact each other. The Parvizian Defendants held this information and did not distribute it; Parvizian even characterized this information as "confidential." The summary judgment evidence establishes that Parvizian refused to disclose the identities of or information about any venturer when it was requested by a venturer multiple times. The summary judgment evidence also reveals an instance where Parvizian attempted to control and deny use of this information when it was accidentally disclosed. An Arcturus employee, Chris Antonson, sent a group email to venturers which mistakenly revealed each venturer's email address rather than including those addresses in the blind copy line. Upon

ORDER – PAGE 16

receiving this email, venturer Rick Ullrey emailed the other venturers in an attempt "to create an organized communication vehicle for the investors."  Mr. Ullrey previously had not been allowed access to any contact information, and his requests for this information had been ignored by Parvizian several times.  When Parvizian found out about Mr. Ullrey's email, he called Mr. Ullrey.  A very angry Parvizian told Mr. Ullrey the venturers' email addresses were "confidential" and his use of this information was a breach of confidentiality.  Parvizian ordered him not to contact the other venturers again or Parvizian "would take legal action against" him.  Mr. Ullrey stated in his declaration that he felt Parvizian would sue him if he contacted the other investors again.

If the venturers did not have any contact information for the other venturers, or felt as if they could not use that information without threat of legal action as Mr. Ullrey did, how could the venturers ever satisfy the minimum percentage interest to exercise these powers cited by the Parvizian Defendants.  These venturers were located across the United States and had no connection to or prior relationship with one another, except possibly for receiving "cold calls" as potential investors from a "leads list".  Any right to vote or call a meeting that required a percentage of the venture interest was absolutely hindered by the inability of the venturers to contact each other.  The Parvizian Defendants failed to address the SEC's contention that

this information was withheld by them.  The Parvizian Defendants do not attempt to establish that the venturers did have access to this information and did not explain how the venturers could effectively exercise their powers when a percentage interest vote was required.

The Court finds a case out of the Eleventh Circuit instructive.  In *Merchant Capital,* the Eleventh Circuit applied the *Williamson* factors and determined that the partnership agreement created many "barriers" to the investors being able to exercise their powers.  *Id.* 483 F.3d at 757-58.  Citing the Supreme Court in *Howey*, the Eleventh Circuit concluded that these barriers were compounded because the investors "were geographically dispersed, with no pre-existing relationships" and there was "a lack of face-to-face contact among the partners".  *Id.* at 758 (quoting *Howey*, 328 U.S. at 299 (Supreme Court found it significant that investments "were offered 'to persons who reside in distant localities.'")).  Furthermore, the Eleventh Circuit determined that powers or votes are illusory when the promoter controls how much information is given to investors and he does "not submit sufficient information for the partners to be able to make meaningful decisions".  *Id.* at 758.  Just as in *Merchant Capital*, these venturers had many barriers to exercise any alleged power under the JVA.  The venturers were geographically dispersed with no pre-existing relationship,

and were completely at the mercy of the Parvizian Defendants for any information related to other investors as well as the venture accounts.

Furthermore, although the Parvizian Defendants refer to other "real" and "significant" powers the venturers possessed, the Parvizian Defendants never offer any detail or evidence in support of this.  Citations to general language in the JVA stating that the venturers were expected to participate in the management of the Joint Venture, that the venturers would collectively control the Joint Venture, and that the Managing Venturer's powers were subject to the venturers' "affirmative vote", are insufficient without more to rebut the SEC's evidence.  For example, the Parvizian Defendants refer to the very "significant" power of the venturers that the Managing Venturer's powers were subject to the affirmative vote of the venturers.  But the Parvizian Defendants do not explain, among other things, how this vote would occur, who would call for a vote, what could trigger such a vote of the venturers.  The summary judgment record established that the majority of the venturers' powers and duties were delegated to the Parvizian Defendants, and any arguable power the venturers still possessed could not be exercised because the necessary information was controlled by the Parvizian Defendants.

Despite the Parvizian Defendants argument to the contrary, the venturers are not similar to general partners.  The Fifth Circuit has stated that "a general

partnership in which some agreement among the partners places the controlling power in the hands of certain managing partners may be an investment contract with respect to the other partners." *Williamson*, 645 F.2d at 423.  Under the express language of the JVA, the venturers delegated to the Managing Venturer: (1) all powers related to the day-to-day management as well as operations of the venture; and (2) "the power to act on behalf of, sign or bind the Joint Venture" or other venturers.  The JVA expressly vested the Managing Venturer with "full and plenary power" regarding all drilling operations, among 13 other listed powers.  The Court finds that this summary judgment evidence supports a finding that the venturers had no real powers; the actual controlling power was in the hands of the Parvizian Defendants.  *See id.*

The Parvizian Defendants respond that the Court must focus on the venturers' understanding of their powers at the time the partnership was formed and what the actual terms of the JVA were.  The Court disagrees.  To determine the reality of the venturers' powers, the Court must look, to some extent, at post-investment activities. *See Merch. Capital*, 483 F.3d at 760.  Otherwise, focusing on just the terms of the partnership agreement would "be inconsistent with the substance over form principle of *Howey*, and would be an invitation to artful manipulation of business forms to avoid investment contract status."  *Id.* (citing *Williamson*, 645 F.2d at 418).  "Post-

investment events can serve as evidence of how much power partners reserved at the inception." *Id.* These venturers were not given actual powers under the agreement when the venture was formed, and then later delegated those duties or powers. These venturers were given what are essentially sham or illusory powers; although listed on paper, these powers never actually existed because the Parvizian Defendants did not intend to allow the venturers to exercise them.

The Court finds that the first *Williamson* factor, that the venturers' lacked actual power, has been established by the SEC's competent summary judgment evidence and the Defendants failed to present sufficient, competent summary judgment evidence to create a genuine issue of material fact on this issue. Because the first *Williamson* factor proves the venturers' dependence on the efforts of the Parvizian Defendants, the Court finds the third *Howey* factor is established. *See Williamson*, 645 F.2d at 424. Accordingly, these Joint Ventures are "investment contracts" and, therefore, are securities.

    b) <u>Venturers were inexperienced and unknowledgeable in oil and gas well business</u>

Even if the first *Williamson* factor had not been satisfied, the Court could look to the second *Williamson* factor to establish complete dependence. Under this factor, the Court considers whether the venturers were inexperienced and lacked expertise in the oil and gas well business. The Court finds the SEC presented sufficient evidence

to establish this second factor.  Courts look to the investor's experience and knowledge in the particular business of the venture at issue, not the investor's general business experience.  *Long v. Shultz Cattle Co., Inc.*, 881 F.2d 129, 134-35 (5th Cir. 1989) (noting that *Williamson* "made clear that the knowledge inquiry must be tied to the nature of the underlying ventures."); *see Howey*, 328 U.S. at 296.  The critical inquiry is whether the investors are inexperienced and unknowledgeable in this particular business making it more likely they would "be relying solely on the efforts of the promoters to obtain their profits."  *Merch. Capital*, 483 F.3d at 762; *see also Long*, 881 F.2d at 134 ("[A] plaintiff may establish reliance on others within the meaning of *Howey* if he can demonstrate not simply that he did not exercise the powers he possessed, but that he was incapable of doing so.").

The Parvizian Defendants contend that this Court must consider the investors' general business experience and knowledge, not just their experience and knowledge of oil and gas industry because that is too narrow.  The Parvizian Defendants are wrong.  In the prior paragraph, the Court stated that binding Fifth Circuit case law clearly requires this Court to examine the venturers' experience and knowledge of the oil and gas industry because the Joint Ventures involve oil and gas well drilling.  Using the correct standard, the SEC provided sufficient, competent summary judgment evidence to establish that these venturers were inexperienced and

unknowledgeable about the oil and gas well drilling.  The Parvizian Defendants, however, did not meet their burden by submitting sufficient competent summary judgment evidence that these venturers had experience or knowledge specifically in the oil and gas industry.

The summary judgment evidence establishes that the Parvizian Defendants' Joint Ventures were marketed through hundreds of daily unsolicited cold calls to thousands of potential venturers whose information came from a "leads list".  The uncontroverted summary judgment evidence also establishes that the Parvizian Defendants' Joint Venture offerings were not limited to potential venturers with experience in or knowledge of the oil and gas industry.  The Tenth Circuit has stated that marketing "oil and gas interests nationwide to investors with little, if any, experience in the oil and gas industry by means of over 400 cold calls a day" supports a conclusion that the investors were so inexperienced or unknowledgeable in business that they were not capable of "intelligently exercising their partnership or venture powers."  *SEC v. Shields*, 744 F.3d 633, 647 (10th Cir. 2014).  Although it is not binding on this Court, the Tenth Circuit's analysis is well-reasoned and the facts are analogous to this case.  The evidence establishes these Joint Ventures were marketed to potential venturers across the nation, through cold calls using "leads lists", and without limiting the offering to potential venturers with experience in oil and gas well

drilling.  This evidence supports a finding by the Court that these venturers were inexperienced or unknowledgeable in the oil and gas industry making it more likely that they were not capable of "intelligently exercising their partnership or venture powers."  *Shields*, 744 F.3d at 647; s*ee Long*, 881 F.2d at 135 (evidence established that plaintiffs, who were scattered geographically from each other and the cattle which formed the basis of the investment, did not have "experience necessary to care for, feed, and market their cattle.").

The Parvizian Defendants argue that the Court must look to the investor group as a whole in evaluating their experience and knowledge, and these venturers are sophisticated and experienced business people who can collectively run the Joint Venture.  The Parvizian Defendants cite the Court to *Nunez v. Robin*, 415 Fed.Appx. 586 (5th Cir. 2011) as support for their proposition that "the partners' sophistication is evaluated collectively, not on a person-by-person basis."  The Parvizian Defendants' contention is simply wrong; *Nunez* does not hold that the investors' generalized business knowledge may be considered collectively.  The Court does not consider what general business knowledge the venturers bring to the Joint Venture. Again, Fifth Circuit case law is clear that the investors' expertise and knowledge "must be considered in relation to the nature of the underlying venture."  *Long v. Shultz Cattle Co. Inc.*, 896 F.2d 85, 135 (5th Cir. 1990)(citing *Williamson*, 645 F.2d at

423).  The Fifth Circuit has emphasized that its discussion in *Williamson* "made clear that the knowledge inquiry must be tied to the nature of the underlying venture." *Long*, 881 F.2d at 135 n. 3.

Regardless of whether the Court were to consider the venturers' expertise collectively or individually, the Parvizian Defendants failed to identify competent summary judgment evidence that any of these investors had expertise and experience in oil and gas well drilling, which was the nature of these Joint Ventures.  In their response, the Parvizian Defendants state, "[A] substantial number of the partners have specific experience investing the in the oil and gas industry."  In support of this, they cite the Court to two pages in their supporting appendix.  The first citation is Parvizian's own declaration where he makes the following generalized statement: "Many of the venturers have extensive experience investing in the oil-and-gas industry, including partnering in multiple joint ventures with [Arcturus and Aschere]."  Nowhere does Parvizian identify any of these "many" venturers with "extensive experience investing in the oil-and-gas industry".  Also, Parvizian does not identify whether the other Arcturus or Aschere joint ventures he references are the subject of this lawsuit.  The second appendix citation is to a multi-page chart that appears to identify venturers.  There is no indication who created the chart, what sources of information were used in creating the chart, or what information is

contained in each column.  But most problematic is that the Parvizian Defendants do not cite the Court to any specific entries in this 10 page chart which might identify the "many" venturers with "extensive experience in the oil-and-gas industry."  It is the Parvizian Defendants' burden to set forth "the precise manner in which that evidence supports [their] claim."  *Ragas v. Tenn. Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998).  "Rule 56 does not impose upon the district court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment."  *Skotak v. Tenneco Resins, Inc.*, 953 F.2d 909, 915-16 & n. 7 (5th Cir. 1992).  The Court will not sift through this information and these numerous entries in an attempt to determine which venturers might have experience in oil and gas industry.

The summary judgment evidence establishes that these venturers, although arguably professionals and people with business experience, had no expertise or knowledge about the oil and gas well business, specifically drilling, and they would have had to rely on information from the Parvizian Defendants to make any decision if they had possessed any powers to exercise.  *See Long*, 881 F.2d at 134-35(even though investors may have "had theoretical control over the investment," agreements were investment contracts because investors lacked knowledge or experience in the cattle business and investors received and relied on information from investment

promoter to make any decision).  Likewise, there is no summary judgment evidence showing they had the knowledge or desire to test, drill and complete these Joint Venture oil and gas wells on an individual basis.  *See Long*, 896 F.2d at 87 (5th Cir. 1990)(investors "were business and professional people" but they "possessed neither the knowledge nor the desire to buy, raise, and market cattle on an individual basis.").  The Parvizian Defendants' focus on these venturers being "collectively sophisticated" in general business is simply contrary to well-established Fifth Circuit case law.  *See Long,* 881 F.2d at 135 n.3.

The Court finds that the second *Williamson* factor, that the venturers lacked experience in and knowledge about the oil and gas industry, has been established by the competent summary judgment evidence.  The Parvizian Defendants failed to meet their burden to create a genuine issue of material fact on this issue with citations to competent evidence in the summary judgment record.  Because the second *Williamson* factor proves the venturers' dependence on the efforts of the Parvizian Defendants, the Court finds the third *Howey* factor is established.  *See Williamson*, 645 F.2d at 424.  Accordingly, these Joint Ventures are "investment contracts" and, therefore, are securities.

c) <u>Venturers were dependent on unique ability of the Parvizian Defendants</u>

Even if the first and second factors had not been satisfied, the third *Williamson* factor could also establish the venturers were complete dependent on the Parvizian Defendants' efforts.  Under this third factor, even if the venturers had possessed actual powers, the Joint Venture is still an investment contract if the venturers have no practical alternative to the manager or they are incapable of competently exercising those powers.  *See Merch. Cap.*, 483 F.3d at 764; *Long*, 881 F.2d at 133. The Court finds the SEC presented sufficient evidence to establish this third factor as well.

Again, the Court finds the Eleventh Circuit's analysis and conclusion in *Merchant Capital* to be helpful and persuasive.  The Eleventh Circuit concluded that the partners had no realistic alternative to the current manager (as well as no actual power to remove him) because the manager "effectively had permanent control over each partnership's assets." *Merch. Capital*, 483 F.3d at 764.  The manager had taken the assets of the different partnerships he managed, combined them, then invested them in "pools of accounts" held by a third-party.  *Id.*  The partnerships had no right, contractual or otherwise, to require the return of their assets in these investment pools; only the manager had a contractual right.  *Id.*  So even if the manager had been

replaced, the assets would not have been accessible to the partners or partnerships. *Id.*

This is factually similar to the case at hand.  The summary judgment evidence shows that the Parvizian Defendants took the investments of each Joint Venture account, placed them into one account Parvizian controlled exclusively, and commingled the funds with money from other Joint Ventures controlled by the Parvizian Defendants, as well as non-Joint Venture money.  This process was never disclosed to the venturers; in fact, the SEC's summary judgment evidence establishes that the venturers believed the Joint Venture's fund were kept in that Joint Venture's account, and was not commingled with any other money.  The venturers had no access to their funds because the money was held in an account controlled exclusively by Parvizian, not the Joint Venture.  Therefore, even if the venturers were able to exercise their power to remove Arcturus or Aschere as Managing Venturer, the Joint Venture and any new Managing Venturer would not have had access to those investment funds and the Joint Venture would have been at risk for failing without access to its assets to fund the drilling.  The Parvizian Defendants do not submit any competent summary judgment evidence controverting that SEC's evidence that the venturers lacked any control over their money which created a complete dependency on the Parvizian Defendants.

In addition, the SEC has presented sufficient evidence that the Parvizian Defendants completely controlled and managed the ventures.  Parvizian himself either drafted, or directed to be drafted, the JVAs, and set the offering and completion pricing which included profit amount.  The JVA appointed Arcturus or Aschere as the Managing Venturer and explicitly authorized the Managing Venturer to control drilling operations, including the power to either retain or act as operator, and to drill, complete, equip, test, rework, operate, recomplete and even plug the well and abandon the prospect.  The language of the JVA also permitted the Managing Venturer to execute documents and hold interests in its own name.  None of the JVA terms were negotiable; venturers were required to consent to all the terms of the JVA as written if they wished to participate in the venture.  As previously discussed, the venturers had no access to information about each other, and even if they had, the Parvizian Defendants controlled what information was shared or disseminated to the venturers.  The Court finds this summary judgment evidence establishes that the venturers completely depended on the Parvizian Defendants as managers.

The Parvizian Defendants respond that they routinely distributed information to the venturers, such as financial information and testing and drilling progress.  But as the Fifth Circuit noted in *Long*, "access to information does *not* necessarily protect an investor from complete dependence on a third party, where, as here, that same

third party is the sole source of the information and advice regarding the underlying

venture and the investor does not have the expertise necessary to make the essential

management decisions himself." *Long*, 881 F.2d at 135-36.  These venturers received

all information related to the Joint Venture from the Parvizian Defendants, and these

venturers had no expertise in the oil and gas business which would have allowed them

to make informed decisions related to the Joint Venture, even if they had actually

possessed real power to make such decisions.  The venturers had no personal or first-

hand knowledge about any activities or decisions related to the Joint Venture; they

relied completely on information distributed by the Parvizian Defendants.  The Court

finds this is further evidence that the venturers were completely dependent on the

Parvizian Defendants.  *See id.* ("access to information does *not* necessarily protect an

investors from complete dependence on a third party where, as here, that same third

party is the sole source of information and advice regarding the underlying venture

and the investor does not have the expertise necessary to make the essential

management decisions himself.").

The Court finds the third *Williamson* factor, the venturers were so dependent on

the Parvizian Defendants as managers, has been established by the competent

summary judgment evidence.  The Court concludes that the Defendants failed to

meet their burden to identify competent summary judgment evidence showing there

is a genuine issue of material fact.  *Anderson*, 477 U.S. at 249.  Because the third

*Williamson* factor proves the venturers' dependence on the efforts of the Parvizian

Defendants, the Court finds the third *Howey* factor is established.  *See Williamson*, 645

F.2d at 424.  Accordingly, these Joint Ventures are "investment contracts" and,

therefore, are securities.

 The Court finds that the Joint Ventures at issue are investment contracts

because each of the three *Williamson* factors is established by the summary judgment

record.  *See Merch. Capital*, 483 F.3d at 756 ("the presence of one of the three

*Williamson* factors renders even a general partnership interest an investment

contract.").  The Parvizian Defendants failed to demonstrate a genuine issue of

material fact as to whether these Joint Ventures are investment contracts and,

therefore, securities within the reach of the Securities Acts.  The Court now turns to

the SEC's four claims against the Defendants.

## 2.  Violations of Sections 5(a) and 5(c) of the Securities Act

 In its third claim against all Defendants, the SEC alleges each Defendant

violated Section 5 of the Securities Act by offering and selling unregistered securities.

In its motion, the SEC contends the summary judgment evidence conclusively

establishes that all Defendants used interstate commerce to offer and sell the Joint

Ventures, which are unregistered securities.  The SEC also argues the Defendants

cannot prove any available exemption from the registration of the Joint Ventures

applies here, and why none of the available exemptions would apply.  In response, the

Defendants argue just that the Joint Ventures are not securities, so there can be no

violation of any securities law, including Section 5.  Defendants put forth no other

responsive argument.

Section 5 violations are strict liability offenses and the defendant's state of

mind is not a consideration.  *See Aaron v. SEC*, 446 U.S. 680, 714 n. 5 (1980);

*Swenson v. Engelstad*, 626 F.2d 421, 424 (5th Cir. 1980).  To establish a *prima facie*

case for Section 5(a) and 5(c) violations, the plaintiff must prove:  (1) defendants

offered or sold securities; (2) the securities were not registered as required by Section

5; and (3) defendants used the United States mail or interstate commerce to offer or

sell the securities.  *Dennis v. Gen. Imaging, Inc.*, 918 F.2d 496, 503-504 (5th Cir.

1990).  Once the SEC satisfies its burden, the defendant then bears the burden of

proving he qualifies for an exemption from the registration requirement.  *SEC v.*

*Cont'l Tobacco Co.*, 463 F.2d 137, 155-56 (5th Cir. 1972).

The Court has already determined the Joint Ventures are "investment

contracts" thereby making them securities.  The SEC argues that each Defendant

offered and sold interests in these investment contracts relating to oil and gas well

drilling, totaling approximately $21.9 million.  The summary judgment evidence

establishes there was no registration on file or in effect for these securities, and the
Defendants used interstate commerce to make offers and sales of the Joint Venture
interests to the venturers.  The SEC met its burden of establishing a *prima facie* case of
Section 5 violations as to each Defendant.  The burden shifted to the Defendants to
establish an applicable exemption, but they merely argued that the Joint Ventures are
not securities.  They failed to meet their burden.

The Court finds there is no genuine dispute of material fact as to whether each
Defendant violated Section 5 of the Securities Act.  Summary judgment in favor of
the SEC is appropriate on its third claim for violations of Section 5 of the Securities
Act against each Defendant.

### 3.   Violations of Sections 15(a) of the Exchange Act

In its fourth claim against Defendants Parvizian, Gonzalez, AMG, Balunas and
R. Thomas, the SEC alleges these Defendants violated Section 15 of the Exchange
Act as unregistered brokers offering and selling securities.  In its motion, the SEC
contends the summary judgment evidence establishes that Defendants Parvizian,
Gonzalez, AMG, Balunas and R. Thomas acted as brokers for purposes of Section 15,
and because they are unregistered brokers and used interstate commerce to offer and
sell interests in the Joint Ventures, which are securities, they violated Section 15.
Just as with the SEC's argument related to Section 5 violation, Defendants respond

that the Joint Ventures are not securities, so there can be no violation of any

securities law, including Section 15.  Defendants put forth no other responsive

argument.

Section 15(a) provides that it is unlawful for a broker or dealer who is not

registered "to make use of the mails or any means or instrumentality of interstate

commerce to effect any transaction in, or to induce or attempt to induce the purchase

or sale of, any security."  15 U.S.C. § 78o(a)(1).  Scienter is not a required element.

*SEC v. Offill*, Civ. Action No. 3:07-CV-1643-D, 2012 WL 246061, at *6 (N.D. Tex.

Jan. 26, 2012)(Fitzwater, CJ)(citing *SEC v. Rabinovich & Assoc., LP*, NO.

07Civ.10547, 2008 WL 4937360, at *5 (S.D.N.Y. Nov. 18, 2008)).   Broker is

defined as "any person engaged in the business of effecting transactions in securities

for the account of others."  15 U.S.C. § 78c(a)(4).  Section 15 does not define the

terms "engaged in business", but courts have defined it as "being 'engaged in the

business' of 'effecting transactions in,' or 'buying and selling,' securities.  *Offill*, 2012

WL 246061, at *7.  The regularity of a defendant's participation in securities

transactions is a strong indicator of "being engaged in the business."  *Id.*  Factors

tending to show regularity of participation include "'the dollar amount of securities

sold . . . and the extent to which advertisement and investor solicitation were used.'"

*Id.* (quoting *SEC v. Kenton Capital, Ltd.*, 69 F.Supp.2d 1, 12 -13 (D.D.C. 1998)).

ORDER – PAGE 35

Section 15 also does not define the term "effecting transactions".  Courts can

consider various factors in deciding whether someone "effected transactions," such as:

(1) did he solicit investors to buy securities; (2) was he involved in negotiations

between the issuer and the investor; and (3) did he receive transaction-related

compensation rather than a salary.  *Offill*, 2012 WL 246061, at *7 (citing *SEC v.*

*Earthly Mineral Solutions, Inc.*, No. 2:07-CV-1057, 2011 WL 1103349, at *3 (D.Nev.

Mar. 23, 2011)).

The Fifth Circuit addressed the definition of "broker" in *Eastside Church of*

*Christ v. Nat'l Plan, Inc.*, 391 F.2d 357 (5th Cir. 1968).  The Fifth Circuit determined

that the defendant's actions "conclusively" proved that he was a "broker" for

purposes of Section 15 violation; these activities included helping churches with all

legal work related to a bond plan, acting as a trustee and financial agent of the

property, and managing the bond sales program including making sales across the

country.  *Id.* at 361.

The Court has already found each of the six Joint Ventures are securities.  The

summary judgment record establishes that Defendants Parvizian, Gonzalez, AMG,

Balunas, and R. Thomas were not registered with the SEC as brokers and they used

interstate commerce when they made telephone calls to offer and sell interests in the

Joint Ventures.  The SEC also presented summary judgment evidence showing:  (1)

Gonzalez, AMG, Balunas, and R. Thomas received transaction-based compensation for the sale of an interest or an "introduction" to a potential venture; (2) Parvizian paid the salaries of AMG employees; (3) Parvizian paid Balunas a monthly "retainer" which was used for business expenses; (4) Gonzalez, AMG, Balunas, and R.Thomas called potential investors, advised them about the Joint Ventures, including terms, provided written materials, and essentially acted as the "link" between potential investors and Parvizian; (5) Parvizian, Gonzalez, and AMG finalized the sale of interests in the Joint Ventures; (6) Parvizian prepared each of the Joint Venture offerings, including written materials, and controlled each Joint Venture Offering; (7) Parvizian received all proceeds related to the sale of any Joint Venture interest, and he exclusively controlled the accounts in which proceeds were deposited; and (8) none of these Defendants were employees of the Joint Ventures themselves. The Court finds the SEC has presented sufficient summary judgment evidence to establish that Defendants Parvizian, Gonzalez, AMG, Balunas, and R. Thomas were acting as "brokers". *See SEC v. StratoComm Corp.*, 2 F.Supp.3d 240, 262 (N.D.N.Y. 2014)(soliciting potential investors to buy securities and being involved in negotiations between issuer and investor are evidence someone is acting as a broker); *Cornhusker Energy Lexington, LLC v. Prospect St. Ventures*, No. 8:04CV586, 2006 WL

2620985, at *6 (D. Neb. Sept. 12, 2006)("[t]ransaction-based compensation, or commissions are one of the hallmarks of being a broker-dealer.").

Defendants Parvizian, Gonzalez, AMG, Balunas, and R. Thomas do not offer any response or summary judgment evidence to controvert the SEC's extensive summary judgment argument that these Defendants were acting as brokers. Instead, they continue to claim the Joint Ventures are not securities so there can be no Section 15 violation. These Defendants failed to raise a genuine issue of material fact on this issue. Summary judgment in favor of the SEC is appropriate on its fourth claim for violations of Section 15 of the Securities Act against all Defendants.

### 4. Securities Fraud

In its first and second claims, the SEC alleges the Parvizian Defendants committed securities fraud in violation of Sections 10(b) of the Exchange Act, Rule 10b-5 thereunder, and 17(a) of the Securities Act. In its motion, the SEC argues the Parvizian Defendants made material misrepresentations and/or omissions about the costs associated with the wells, the use of the investors' money, and the right to participate in drilling of a well associate with a specific Joint Venture. The SEC rests its summary judgment argument on two examples of the Parvizian Defendants' alleged fraud: (1) approximately 65% of the investors' money was spent on things other than the primary purpose of the investment, which was drilling, testing, and

completing the wells, and this directly conflicted with representations in the Offering Documents; and (2) the Parvizian Defendants offered and sold investments in a Joint Venture of a well in which they had no ownership interest, so there was no right to participate in the drilling and no claim to any possible revenues generated.  The Parvizian Defendants respond that:  (1) the allegedly false statements cited by the SEC do not support a fraud claim; (2) the SEC's allegations about lack of any ownership interest in one of the wells is factually inaccurate; and (3) the SEC did not establish the Parvizian Defendants acted with the requisite scienter.  Because they did not make material misrepresentations or omissions, the Parvizian Defendants contend the SEC is not entitled to summary judgment on these fraud claims.

Section 10(b) of the Exchange Act makes it unlawful "[t]o use or employ, in connection with the purchase or sale of any security . . ., any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors."  15 U.S.C. § 78j(b).  Rule 10b-5 makes it unlawful for any person, directly or indirectly, to:

(1)    Employ any device, scheme, or artifice to defraud;

(2)    Make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the

light of the circumstance under which they were made, not misleading,
or

(3)     Engage in any act, practice, or course of business which operates or
would operate as a fraud or deceit upon any person in connection with
the purchase or sale of any security.

17 C.F.R. § 240.10b-5.  To establish a *prima facie* case under Section 10 and Rule
10b-5, the SEC must prove the Defendants: (1) made a material misrepresentation or
omission, or used some other fraudulent device; (2) in connection with the offer, sale,
or purchase of a security; and (3) acted with scienter.  *SEC v. Hopper*, No. Civ. A. H-
04-1054, 2006 WL 778640, at * 9 (S.D. Tex. Mar. 24, 2006).

Section 17(a) of the Securities Act makes it unlawful for any person in offering
or selling any securities to, directly or indirectly:

(1)     Employ any device, scheme, or artifice to defraud, or

(2)     Obtain money or property by means of any untrue statement of a
material fact or any omission to state a material fact necessary in order
to make the statements made, in light of the circumstances under which
they were made, not misleading, or

(3)     Engage in any transaction, practice, or course of business which operates
or would operate as a fraud or deceit upon the purchaser.

15 U.S.C. § 77q(a).  To establish a *prima facie* case under Section 17(a), the SEC

must essentially prove the same elements as for Section 10 and Rule 10b-5 violations,

except scienter is not an element under Section 17(a)(2) or 17(a)(3).  *Hopper*, 2006

WL 778640, at * 9.  Those subsections require a showing of just negligence.  *Id.*

(citing *Meadows v. SEC*, 119 F.3d 1219, 1226 n. 15 (5th Cir. 1997)).

Initially, the Parvizian Defendants again contend these ventures are "outside

the [SEC's] jurisdiction as there are no 'securities' at issue."  This argument fails as

the Court has already found that the Joint Ventures at issue are investment contracts

and, therefore, securities.  Because the Court has already made this determination,

the second factor of a *prima facie* case of liability under Section 10(b), Rule 10b-5 and

Section 17(a) is established—the statements were made in connection with the offer,

sale or purchase of securities.  The Court now turns to the first and third factors:

whether the Parvizian Defendants made a material misrepresentation or omission, or

used some other fraudulent device, and whether they acted with the requisite mental

state.

a) Material Misrepresentation or Omission or Other Fraudulent Device

The Fifth Circuit has stated that "the standard for misrepresentation is

whether the information disclosed, understood as a whole, would mislead a

reasonable potential investor."  *Trust Co. of La. v. N.N.P. Inc.*, 104 F.3d 1478, 1490

(5th Cir. 1997).  Stated another way, the statement or omission is "'material' if there is a substantial likelihood that a reasonable investor would consider the information important in making a decision to invest." *ABC Arbitrage Plaintiffs Group v. Tchuruk*, 291 F.3d 336, 359 (5th Cir. 2002).

The SEC argues there are two examples of securities fraud the Parvizian Defendants committed.  The Court first addresses the SEC's contention that the Parvizian Defendants committed securities fraud related to the Fraley-Nelson Joint Venture.  Specifically, the SEC argues the Parvizian Defendants omitted material facts when they failed to disclose to potential investors in the Fraley-Nelson Joint Venture that the Parvizian Defendants had no ownership interest in that well, so there was no right to participate in the drilling and no claim to any possible revenues generated.  The summary judgment evidence establishes that the Parvizian Defendants had no working interest in the Fraley-Nelson well when the Joint Venture offering began.  In April 2010, the seller of the Frayley-Nelson well prospect notified Parvizian that Arcturus failed to pay the $594,504.50 balance due on its working interest and no election had been made, so Arcturus had forfeited its rights to participate in the well prospect.  Parvizian admitted he knew this relationship had been terminated.  Yet beginning in June 2010 through September 2010, after Arcturus's working interest had been terminated, the Parvizian Defendants offered

and sold units to venturers in the Frayley-Nelson Joint Venture for testing, drilling

and completion of a well to which they had no right to participate.  Parvizian

admitted he did not disclose to any of these investors that Arcturus's working interest

had been terminated, which precluded any right to participate in the drilling and to

share in any profits.  The Court concludes there is a substantial likelihood that a

potential investor in the Frayley-Nelson Joint Venture would find it important in

making their investment decision to know that the Parvizian Defendants had

forfeited their working interest in the well, giving them no right to participate in any

testing and drilling—the exact business purpose of their potential investment.  *See*

*SEC v. Whitworth Energy Res. Ltd.*, 243 F.3d 549, \*2 (9th Cir. 2000)("[A]n

overstatement of ownership interest in 400 wells [of joint venture offerings]

constituted additional material misrepresentations.").  The Court finds the omission

of this information to be highly material.  *See Tchuruk*, 291 F.3d at 359.

     The Parvizian Defendants respond that the SEC's allegations are factually

inaccurate.  Specifically, the Parvizian Defendants contend that their working interest

in the Frayley-Nelson well is in dispute and Parvizian fully expects this dispute will be

resolved in their favor.  They further argue that none of the venturers suffered any

losses.  Neither of these arguments has any merit and does not create a genuine issue

of material fact.  First, the fact that the venturers did not suffer any losses has no

bearing on this issue or its analysis.  The Court looks to whether "a reasonable

investor would consider the information important in making a decision to invest."

*Id.*  No consideration is given to any financial injuries resulting from an investment

being made.  As for the Parvizian Defendants' contention that a more factually

accurate statement is that Arcturus's working interest was in dispute, the result would

not change even if the Court were to agree.  Parvizian admitted he did not disclose

any information to potential investors about their working interest—even that it was

allegedly "in dispute".  The Court concludes any potential investor would find it

important in making their investment decision to learn that the Parvizian

Defendants' working interest in the Frayley-Nelson well was, at the very least, "in

dispute", because this would call into question any right to participate in testing and

drilling of the well—the exact business purpose of their potential investment.  *See id.*

The Court finds this would also be a material omission.  *See Whitworth Energy*, 243

F.3d at *2 ("[A]n overstatement of ownership interest in 400 wells [of joint venture

offerings] constituted additional material misrepresentations.").  Whichever way the

factual allegations are cast, both of the aforementioned omissions satisfy the first

factor of a *prima facie* case of fraud.  The Parvizian Defendants failed to meet their

burden to produce evidence establishing a genuine issue of material fact.  Because the

Court finds this omission related to the Frayley-Nelson Joint Venture to be material,

the Court need not address the SEC's other example of alleged securities fraud committed by the Parvizian Defendants.

      b)  <u>Scienter</u>

Scienter is a mental state involving an "intent to deceive, manipulate or defraud." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 (1976).  The Fifth Circuit has stated that scienter can also be established with severe recklessness.  *Broad v. Rockwell Int'l Corp.*, 642 F.2d 929, 961-62 (5th Cir. 1981)(en banc); *see also Plotkin v. IP Axess Inc.*, 407 F.3d 690, 697 (5th Cir. 2005) (citing *id.*).  The Fifth Circuit defined severe recklessness as "those highly unreasonable omissions or misrepresentations that involve not merely simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and that present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it." *Broad*, 642 F.2d at 961-62.

      The SEC argues Parvizian knew Arcturus's interest in the Frayley-Nelson well had been terminated before the Frayley-Nelson Joint Venture was offered and interest units sold to venturers.  According to the SEC, his knowledge of this information "evidences a high degree of scienter.  In response, the Parvizian Defendants argue only that scienter is fact-specific, and the SEC failed to meet its burden and simply restated its fraud theories.

Parvizian admitted that:  (1) he knew Arcturus's working interest in the

Frayley-Nelson prospect well was terminated in April 2010; and (2) he did not

disclose this fact, or even his characterization that the working interest was in

dispute, to potential investors when he offered and sold units between June and

September 2010.  The Court finds Parvizian intended to "deceive, manipulate or

defraud" the potential investors with this material omission.  *See Ernst*, 425 U.S. at

193.  Parvizian admitted he knew that Arcturus's working interest in the Frayley-

Nelson well had been terminated; yet, two months after learning this, Parvizian began

offering and selling investment units in this well for the express business purpose of

testing, drilling and completing the well.  Failing to disclose this information, which

Parvizian admitted knowing, to potential venturers in the Frayley-Nelson Joint

Venture most certainly created a risk that they would be misled.  *See SEC v. Profit*

*Enter., Inc.*, Civ. A. No. 90-2020, 1992 WL 420904, at *5 (D.D.C. Nov. 16,

1992)(misrepresentations which included ownership interest in well was evidence of

scienter, either that promoter knew of their falsehood or at least demonstrating

recklessness).  The Court finds Parvizian acted with severe recklessness in omitting

this information that he knew would be "an extreme departure from standards of

ordinary care" which created "a danger of misleading buyers" of units in the Frayley-

Nelson prospective well.  *See Broad*, 642 F.2d at 961-62.

Parvizian's scienter can be imputed to Aschere and Arcturus.  "[T]he scienter of executives can be imputed to corporate entities" for purposes of claims arising under federal securities laws.  *SEC v. Treadway*, 430 F.Supp.2d 293, 337 (S.D.N.Y. 2006).  Parvizian is the sole managing member and president of Aschere, and 100% shareholder and president of Arcturus.  The record establishes that Parvizian was solely in control of both Aschere and Arcturus, and he was solely responsible for all information related to the Frayley-Nelson well prospect that was disseminated and likewise all material information that was withheld or omitted.  Aschere and Arcturus both participated in the Frayley-Nelson well—Aschere was the Managing Venturer and Arcturus allegedly held the working interest in the well.  The Court finds the summary judgment record clearly supports a finding that Parvizian's scienter can be imputed to Aschere and Arcturus.  *See SEC v. Wolfson*, No. 2:03CV914, 2005 WL 6796532, at *2 (D. Utah Nov. 29, 2005)(court granted summary judgment for SEC on its claims of Section 17(a), Section 10(b), and Rule 10b-5 violations, finding individual defendant's scienter could be imputed to defendant entity he solely controlled); *see also SEC v. Thibeault*, 80 F.Supp.3d 288, 292 (D. Mass. 2015)("[D]efendant's] scienter is imputed to the other defendants because he controlled each of those entities.").

The Court concludes the SEC met its burden and the summary judgment record shows Parvizian had the requisite scienter which can be imputed to both Aschere and Arcturus.  The third factor of a *prima facie* case of securities fraud has been established.  The Court finds the Parvizian Defendants failed to meet their burden to present evidence to create a genuine issue of material fact as to this element.

c)  <u>Negligence</u>

To establish a prima facie case under Section 17(a), the SEC is required to prove basically the same elements as for Section 10 and Rule 10b-5 except scienter is not an element under Section 17(a)(2) or 17(a)(3).  *Hopper*, 2006 WL 778640, at * 9.  The SEC need only make a showing of just negligence for these subsections.  *Id.* The Court has already determined the evidence conclusively establishes the Parvizian Defendants acted with the requisite scienter for Section 10 and Rule 10b-5 violations.  Therefore, the Court finds the summary judgment record most certainly supports a finding the Parvizian Defendants acted negligently in relation to securities fraud violations under Section 17(a)(2) and/or 17(a)(3).

d)  <u>Conclusion</u>

The Court finds the SEC established a *prima facie* case of securities fraud violations under Section 10 of the Exchange Act and Rule 10b-5 thereunder against

the Parvizian Defendants related to the Frayley-Nelson Joint Venture.  The Court also finds the SEC established a prima facie case of securities fraud violations under Section 17(a) of the Securities Act against the Parvizian Defendants as to the Frayley-Nelson Joint Venture.  The Parvizian Defendants failed to meet their burden to present summary judgment evidence to establish a genuine issue of material fact on the SEC's fraud claims.  Accordingly, summary judgment is appropriate on the SEC's first and second claims of securities fraud violations.

### D. Conclusion

The Court finds the SEC has sufficiently established a prima facie case for each of its claims:  (1) securities fraud violations of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder against the Parvizian Defendants; (2) securities fraud violations of Section 17(a) of the Securities Act against the Parvizian Defendants; (3) violations of Sections 5(a) and 5(c) against all Defendants for the offer and sale of unregistered securities; and (4) violations of Section 15(a) of the Exchange Act for the offer and sale of securities by unregistered broker-dealer.  The Court also finds the Defendants failed to meet their burden to present competent and sufficient summary judgment evidence to create a genuine issue of material fact as to any of the claims asserted against them by the SEC.  Accordingly, the Court **grants** summary judgment on each of the SEC's claims against the Defendants.

### III.    Motions to Strike

The SEC filed a motion to strike uncited paragraphs of Parvizian's declaration as well as certain exhibits submitted in support of the Defendants' motion for summary judgment.  The Parvizian Defendants also filed a motion to strike the declaration of Ty Martinez submitted in support of the SEC's summary judgment motion.  The Court **denies** both motions, and notes that the Court's ruling on the summary judgment motions would not change were the Court to grant either motion to strike.

### IV.    Conclusion

The Court finds Plaintiff SEC' motion for summary judgment must be **granted**. The Court also finds the Defendants' motion for summary judgment, the SEC's motion to strike, and the Parvizian Defendants' motion to strike should be **denied**. The Court will refrain from imposing remedies on each Defendant at this time.  The Court **orders** the SEC to submit a brief to the Court **on or before April 22, 2016** addressing appropriate and available remedies it seeks to be imposed against each Defendant resulting from their violations.

**SO ORDERED.**

Signed March 21st, 2016.

*Ed Kinkeade*
ED KINKEADE
UNITED STATES DISTRICT JUDGE

ORDER – PAGE 50